THE STATE, THE BOARD OF CHOSEN FREEHOLDERS OF BURLINGTON COUNTY, PROSECUTOR, v. THE BOARD OF CHOSEN FREEHOLDERS OF ATLANTIC COUNTY.

The court will not disturb the report of commissioners appointed to ascertain the partition line between counties, except upon clear proof that it is wrong.

On *certiorari* to review report of commissioners, &c.

Argued at November Term, 1886, before Justices KNAPP and DIXON.

For Burlington county, *Jos. H. Gaskill.*

For Atlantic county, *Joseph Thompson.*

The opinion of the court was delivered by

DIXON, J.   This *certiorari* brings up for review the survey of commissioners appointed under the act of March 5th, 1798 (*Rev.*, p. 211), to ascertain a part of the boundary between the counties of Burlington and Atlantic.   The controversy relates to the location of a line which, in section 6 of the statute passed January 21st, 1709–10 (*Rev.*, p. 198), is described as running from the mouth of Little Egg Harbor river " to the next inlet on the south side of Little Egg Harbor's most southerly inlet."

While the court is required, by the act of February 17th, 1881 (*Pamph. L.*, p. 34), to determine disputed questions of fact in proceedings such as the present (*Union* v. *Essex*, 14 *Vroom* 391), still, in determining such questions, the official certificates of the commissioners, under their oath and in the line of their duty, are entitled to much weight as evidence, and only clear proof of great force will justify us in concluding that they are erroneous.   *Hunt* v. *Rahway*, 10 *Vroom* 646, 11 *Vroom* 615 ; *Rettinger* v. *Passaic*, 16 *Vroom* 146 ; *Jelliff* v. *Newark*, 19 *Vroom* 101.

. The evidence laid before us does not warrant our saying that the commissioners are wrong. The terms in which the disputed line is described require that there should be found at least two inlets to Little Egg Harbor, so that an inlet " on the south side of the most southerly " of these inlets may be taken as one end of the line. The counsel for Burlington county concedes that the line does not run so far south as Absecon Inlet, while Barnegat Inlet is undoubtedly far north of Little Egg Harbor, and therefore, to satisfy the description in controversy, the existence of at least three inlets between Absecon and Barnegat is indispensable. There is nothing before us, outside of the statute of 1709–10 itself, which indicates so many inlets near that date. Ancient maps, some older, some more recent than the statute, show only one or two such inlets ; ancient surveys, all since the statute, lend no aid, and tradition goes back no further than about 1790, when " New Inlet " was formed. The testimony of witnesses proves that the nature of the beach in that neighborhood is very shifting, and that the opening, moving and closing of inlets, by violent storms upon the coast, are matters of comparatively frequent occurrence. It also seems probable that the shore is now considerably west of its former position, and that its direction in particular localities is changed. Hence I think it may fairly be said that upon the evidence laid before us, the situation of the inlets called for by the statute of 1709–10 is a subject for conjecture only. But on mere conjecture we have no right to disturb the judgment of the commissioners.

If we give up the search for the inlets of 1709–10, and look for some practical location of the boundary or common understanding as to its whereabouts since it was declared, the uncertainties are not removed.

The earliest survey to which our attention is directed is the Thomas Marks survey, made in 1733, which locates Marks' Island in Gloucester county. This is consistent with the commissioners' report and with the claim of Atlantic county, but is inconsistent with the claim of Burlington county. The next, called the Alford survey, made in 1737, carries the line

of Gloucester county much further to the north than the com-
missioners have placed it, and therefore is still less favorable
to Burlington county. Following this is the Clayton New-
bold survey of 1773, which placed Anchoring Island, lying
north of the commissioners' line, in Gloucester county. This
also opposes the claim of Burlington county. Next comes the
patent of King George III., in 1774, creating the township
of Galloway out of the northeast part of the township of Great
Egg Harbor, in the county of Gloucester, which describes the
northeasterly line of the new township as running from the
mouth of Little Egg Harbor river, " south, thirty-five degrees
east, six miles and a quarter, through the great bay of Little
Egg Harbor, to the southwest end of the flat beach at Brig-
antine Inlet." This line locates Brigantine Inlet nearly be-
tween Marks' Island and Pullen's Island, and if it be taken
as the county line would give Burlington county about one-
half of what it now claims against the commissioners' line, but
it is inconsistent with all of the surveys before mentioned.
The Ladd survey of 1742 is confessedly all in Gloucester
county, and it does not purport, on its face, to run to the county
line. It is used only to locate Brigantine Inlet at that time.
Even for this purpose its value depends upon the ability to
locate a row of red cedars which have long been obliterated,
or upon the situation of Absecon Inlet, which has probably
changed, and upon lines the length of which is uncertain.
The inaccuracy of the measurements in these surveys is exem-
plified by the fact that while Brigantine Inlet appears, by the
Ladd survey of 1742 (according to the contention on behalf
of Burlington county), to have been where it now is, it ap-
pears by the Alford survey of 1737, made by the same sur-
veyor, to have been about three miles north of where it now
is, i. e., about three and a quarter miles south of Old Inlet
and near the present situation of New Inlet.

Soon after King George's patent to Galloway township,
New Inlet broke through, and has since been the principal
inlet in the neighborhood. It has undoubtedly had much in-
fluence on the opinions of people as to the county line. But

these opinions, whether exhibited in surveys, on maps, or by living witnesses, are so variant that no pertinent fact seems ascertainable by them. While I think the weight of evidence since the king's patent would put the boundary south of where the commissioners have placed it, yet unless I should be controlled by some single circumstance, where none is conclusive, I could not define its location.

Nor is the doubt solved by accepting, what is assumed on behalf of Burlington county, that the inlet at which the line ended was one afterwards known as Brigantine Inlet. Since the Alford survey of 1737 an inlet called by this name has existed across the beach at various points from the present location of New Inlet to the present location of Brigantine Inlet, moving sometimes north, sometimes south, sometimes closing, and again opening in another spot. Where such an inlet was in 1709–10 is past finding out, on the evidence brought to our notice.

There is no ground for setting aside the survey of the commissioners, and it must be affirmed.